## ANNIE V. PARTELLO v. MISSOURI PACIFIC RAILWAY COMPANY, Appellant.

### Division Two, March 30, 1909.

1. **OPINIONS: Non-Expert.** A non-expert witness may give his opinion as to the apparent health of the injured plaintiff whom he has had opportunity to observe—her apparent health both before and at the time of her injury.

2. **DAMAGES: Instruction: Not Exceeding Alleged Amount.** An instruction in a personal injury case telling the jury that "if they should find for plaintiff they will assess her damages at such sum . . . . not exceeding the total sum of fifty thousand dollars" (the amount which it is alleged in the petition she has sustained), is not erroneous. It is not the law that such an instruction is proper only in cases growing out of contract where the damages are susceptible of easy ascertainment.

3. ———: ———: **Elements.** An instruction which embraces as elements of damage no matter of importance not covered by the petition, is not erroneous as submitting to the jury issues not presented by the petition. And in this case the criticism of the instruction to the effect that it did present such issues is held to be too technical.

4. **EXCESSIVE VERDICT: $30,000: Nervous Troubles.** Plaintiff was a passenger on a railroad train, and when it collided with another train in the yards she was thrown forward from her seat in the chair car, her face striking the back of the chair immediately in front of her, and she fell to the floor

on her knees. Her nose bled freely and she seemed to suffer great pain, and was in a semi-conscious condition. At the hospital she was in an unconscious condition, and the nurse testified that there was a displacement of the womb, and the physicians who attended her at the hospital placed her womb in place, forcing it back with a pack, but no physician testified that there was a permanent displacement. She remained in the hospital for five weeks, and during the early part of that time the abdominal regions were swollen and very sore, she was unable to sleep without opiates, and suffered from nervousness and nausea. Her womb was much enlarged, but not extraordinarily sensitive, but her side was somewhat swollen and very sensitive to pressure. She left the hospital and went by sleeper to her home in Ft. Reno, and on arriving there was in a fainting condition, and for hours was partly unconscious. She remained in bed two or three months, there was great tenderness and a swelling in the abdomen which lasted for weeks, and the broad ligaments supporting the womb, and the surrounding tissues, were inflamed and enlarged, and she· became emaciated and sallow. All the' physicians testified that her condition might result from a severe muscular strain or a blow, or concussion, and some of them testify· that she is without rallying power and that the injury had almost destroyed her nervous system and that the injuries are permanent; others testify that they are not permanent. None of her bones were broken, and no joint dislocated or injured, and at the time of the trial there was no apparent disfigurement save a slight mark on the nose. At the time of the accident she was 46 years old, and 'had previously been in excellent health, lived an active life, was agile, and in every way sound. The jury returned a verdict for $30,000, and while a motion for a new trial was· pending she voluntarily filed a *remittitur* of $10,000. *Held*, that plaintiff was entitled to just and adequate compensation for her injuries, pain and suffering, and no more, there being. no element of malice in the case; and the verdict is so large that the ends of justice would be conserved by a new trial.

Appeal from Jackson Circuit Court.—*Hon. Edw. P. Gates*, Judge.

REVERSED AND REMANDED.

*Martin L. Clardy* and *Elijah Robinson* for appellant.

(1) The court committed error in permitting the plaintiff to read depositions of non-expert witnesses,

in which they expressed opinions as to her physical condition. Sharp v. Railroad, 114 Mo. 94; Railroad v. Demsey, 89 S. W. 786. (2) The court committed error in giving plaintiff's instruction 5, on the measure of damages. 1. Said instruction amounted practically to a statement to the jury that, in the opinion of the court, the evidence warranted them in returning a verdict for any sum up to $50,000. Bryan v. Acee, 27 Ga. 87; Glasscock v. Shell, 57 Tex. 224; Willis & Bro. v. McNeill, 57 Tex. 478; Fordyce v. Nix, 23 S. W. 967; Gilbertson v. Railroad, 43 N. Y. Supp. 782; Railroad v. Austin, Admx., 69 Ill. 428; Railroad v. May, 33 Ill. App. 366; Rost v. Brooklyn Heights, 41 N. Y. Supp. 1069. 2. Said instruction was also erroneous, in that it submitted to the jury issues not made by the pleadings—was broader than the petition. Bank v. Westlake, 21 Mo. App. 565; State ex rel. v. Sitlington, 51 Mo. App. 256; Harper v. Railroad, 70 Mo. App. 604; Colliott v. Mfg. Co., 71 Mo. App. 163; Edwards v. Railroad, 79 Mo. App. 257; Kattleman v. Fire Assn., 79 Mo. App. 447; Kirby v. Railroad, 85 Mo. App. 345; Pryor v. Railroad, 85 Mo. App. 367; Fegan v. Grain Sep. Co., 92 Mo. App. 236; Budd v. Hoffheimer, 52 Mo. 297; Pinney v. Berry, 61 Mo. 366; Bank v. Murdock, 62 Mo. 70; Abbott v. Railroad, 83 Mo. 271; Mellor v. Railroad, 105 Mo. 455; Coontz v. Railroad, 115 Mo. 669; Slaughter v. Railroad, 116 Mo. 269; Chitty v. Railroad, 148 Mo. 64; De Donato v. Morrison, 160 Mo. 581; Wolfe v. Supreme Lodge, 160 Mo. 675; Heinzle v. Railroad, 182 Mo. 528; Logan v. Railroad, 183 Mo. 582. (3) The verdict was so grossly excessive as to show conclusively that the nine jurors who signed it were influenced by prejudice against defendant or sympathy for plaintiff, and that their verdict was not the result of a fair and impartial consideration of the evidence in the case, and for that reason the judgment ought to be reversed. Baker v. Stonebraker, 36 Mo. 338; Spohn v. Railroad, 87 Mo.

84; Ice Co. v. Tamm, 90 Mo. App. 202; Adams v. Railroad, 100 Mo. 555; Chlanda v. Railroad, 112 S. W. 249; Cook v. Railroad, 94 Mo. App. 425; Whalen v. Railroad, 60 Mo. 323; Nichols v. Glass Co., 126 Mo. 55; Furnish v. Railroad, 102 Mo. 438; Chitty v. Railroad, 166 Mo. 435.

*Reed, Yates, Mastin & Harvey* for respondent.

(1) No error was committed in any ruling by the court admitting non-expert testimony as to respondent's physical condition before and after the injury. 3 Wigmore on Evidence, p. 2616, and many authorities cited; Fulton v. Railroad, 125 Mo. App. 247; State v. Buchler (stating rule), 103 Mo. 207; Lawson, Expert and Opinion Ev., p. 470; State v. Ramsey, 82 Mo. 137; State v. Parker, 96 Mo. 393; State v. David, 131 Mo. 394; Binsbacher v. Railroad, 108 Mo. App. 3; Wilkenson v. Mosely, 30 Ala. 572; Railroad v. McLendon, 63 Ala. 275. "A non-expert is competent to give his opinion as to the apparent health of a person whom he has had the opportunity to observe, this being a matter open to the senses, but incapable of exact description." 12 Am. and Eng. Ency. Law, 491; Hardy v. Merrill, 56 N. H. 227; 1 Wharton on Evidence, sec. 513. (2) 1. Plaintiff's instruction 5, on measure of damages, in that it confines the jury to the amount prayed for in the petition, follows the precedent of every instruction given in Missouri since courts were established. Hundreds of cases approving a like instruction might be cited. We content ourselves with Dougherty v. Railroad, 97 Mo. 657; McNamara v. Railroad, 106 Mo. App. 352; Devoy v. Railroad, 192 Mo. 207; Stobier v. Railroad, 203 Mo. 712; Girard v. Coal Co., 207 Mo. 258; Logan v. Railroad, 183 Mo. 591. 2. The instruction in question is not broader than the petition. If counsel thought it too broad they should have asked its modification. Swearingen v.

Coal Co., 111 S. W. 545.   (3) The verdict is not ex-
cessive, if plaintiff is in the physical condition de-
picted by the evidence.  Waldhier v. Railroad, 87 Mo.
307; Markey v. Railroad, 185 Mo. 356; Reynolds v.
Railroad, 189 Mo. 409.  The recent trend of judicial
opinion favors sustaining larger verdicts for perman-
ent and practically total disabilities.  Strand v. Rail-
road, 101 Minn. 85 ($20,000); Railroad v. Nesbit (Tex.
Civ. App.), 97 S. W. 825 ($20,950); Huggard v. Glucose
Sug. Ref. Co., 132 Ia. 724 ($32,916); Railroad v.
Connelly (Neb.), 109 N. W. 368 ($27,500); Railroad
v. Vanlandingham (Tex. Civ. App.), 85 S. W. 847
($25,000); Railroad v. Toliver (Tex. Civ. App.), 84
S. W. 375 ($19,500); Smith v. Whittier, 95 Cal. 279
($30,000); Railroad v. Brazzil, 78 Tex. 314 ($20,000);
Railroad v. Ewing, 7 Tex. Civ. App. 8 ($20,000); Al-
berti v. Railroad (N. Y.), 43 Hun 421 ($25,000); Har-
rold v. Railroad (N. Y.), 24 Hun 184 ($30,000); Hall
v. Railroad, 46 Minn 439 ($25,000); Railroad v. Fried-
man, 41 Ill. App. 270 ($30,000); Railroad v. Holland,
18 Ill. App. 418 ($25,000).

BURGESS, J.—This is an action for damages for
personal injuries received by plaintiff in a collision
occuring on defendant's railroad, and alleged to have
been caused by the negligence of defendant, its agent
and servants.  The jury trying the cause returned a
verdict for $30,000 in favor of plaintiff, and judgment
was rendered accordingly.  Afterwards, upon the hear-
ing of defendant's motion for a new trial and in arrest
of judgment, plaintiff, by attorney, remitted $10,000
of said judgment.  The court overruled defendant's
said motions, whereupon an appeal was taken to this
court.

Plaintiff is the wife of an army officer, stationed
at Ft. Reno, Oklahoma.  On the 9th day of October,
1904, plaintiff, her husband, daughter and son, were
passengers on one of defendant's trains going from

the union depot at Kansas City to Leavenworth, Kansas, and when the train was passing through the defendant's yards, in Kansas City, at a point about three hundred yards west of the union depot, the engine collided with the tender of another engine. A crossing switch was left open, and the engine, instead of proceeding westwardly on the main track, ran in on this cross-over track and collided with the tender of the other engine which was backing eastwardly on another track. The pilot or cowcatcher of the passenger engine, by reason of the collision, was broken and the forward part of the engine damaged, and the trucks of the tender of the other engine were knocked off the track and a large hole made in the water tank. When the collision occurred, plaintiff was thrown forward from her seat in the chair car, her face striking the back of the chair immediately in front of her, causing her nose to bleed, and she fell to the floor on her knees. Dr. A. J. McDonald, a dentist residing in Kansas City, was sitting on the opposite side of the aisle from plaintiff, and he, with Major Partello, plaintiff's husband, assisted her back to her seat. She was bleeding freely at the nose and seemed to be suffering great pain, and Dr. McDonald got a damp towel and bathed her face and otherwise tried to alleviate her suffering. This witness testified that the concussion between the two engines was violent, and threw him forward, but that he put his hands on the seat in front of him, and remained uninjured. He further testified that nothing intelligible was said by plaintiff in his presence, after she was injured, but that she was in a semi-conscious condition, and moaning practically all the time. Plaintiff was removed through the car window on a stretcher and taken to St. Joseph's hospital, she being at the time in an unconscious condition. Describing her condition, afted she regained consciousness, she said, "I felt as though I was hurt in some way in my lower parts,

and could not move them.'' Dr. Fulton and Dr. Hamel, two surgeons connected with the defendant railway company, came to see plaintiff on the day of the injury and administered strychnine, and put her womb back in place, Dr. Fulton forcing it back in place with a pack.

Miss Carrico, the nurse who waited on plaintiff at the hospital, testified that when plaintiff came to the hospital she was in great pain and continually asked for something to relieve her. She saw Dr. Fulton examine plaintiff, and force back her womb by means of a pack saturated with ichthyol oil. The doctors also applied antiphlogistine to the lower part of her abdomen, on the right side, which was greatly swollen, and this treatment was continued for weeks. During plaintiff's stay at the hospital she was unable to sleep without the aid of an opiate, and she suffered from nervousness and nausea. She failed in flesh, and during the first three weeks of her stay at the hospital she was out of bed once, when she was put in an invalid's chair and taken to the porch for a few minutes. After plaintiff had been at the hospital some two or three weeks, Dr. Lester Hall, who had been asked by plaintiff's husband to attend his wife, performed a minor operation on plaintiff. He found that in giving birth to her first child the perineum was lacerated, and he cut away the old scar tissue and sewed up the lacerated perineum.

At the end of five weeks, plaintiff left the hospital and was taken in a carriage to the Coates House, in Kansas City, where she remained three days, and then took a night train for home, lying down in a sleeper as soon as she entered it. Reaching Ft. Reno, she was immediately put to bed, which she was unable to leave, even with the help of assistants, for two or three months afterwards, during which time a nurse constantly attended her. Dr. A. M. Chase, an army surgeon stationed at Ft. Reno, was called in immediately

upon Mrs. Partello's arrival. He found her in a fainting condition, and gave her several hypodermic injections of strychnine, and did not leave her for hours. She was partially unconscious; her extremities were cold and pulseless and she was without rallying power. In appearance, she was emaciated and sallow. A few days later Dr. Chase made a physical examination of plaintiff, and found the womb fixed and the patient suffering from great tenderness of the abdomen. The broad ligaments supporting the womb, and the surrounding tissue, he found inflamed and enlarged. There was also a swelling in the abdominal region which lasted for weeks. In his opinion this condition was due to an acute injury, a blow or concussion. He visited her three times a day for a period of about two months, and continued to visit her at intervals up to the time of testifying; he thought that the injury received by plaintiff had almost destroyed her nervous system, and that her health and vigor were permanently impaired.

Dr. J. H. Ford, assistant surgeon at Ft. Reno, testified that plaintiff, before her injury, was remarkably strong and robust and in excellent health. She had been accustomed, as the wife of the commanding officer, to attending the balls and social functions at the fort, and taking a leading part therein, and she was also fond of doing her own housework, although it was not necessary for her to do so. She had not suffered from any chronic disease or serious womb trouble. The first time Dr. Ford saw plaintiff after the infliction of the injury was on November 15, 1904, at the Coates House, after she left the hospital and just prior to her return to Ft. Reno. To him "her appearance indicated that she had undergone some violent shock." "She had lost greatly in weight, and was suffering from a nervous lack of strength." He further testified that her ill condition had steadily progressed, and that she was a nervous and physical wreck. He did not

think it possible that she could ever be restored to health.

Dr. John R. Snell, a physician living in Kansas City, made an examination of plaintiff just before the trial, and testified that he regarded Mrs. Partello as a nervous wreck and that her ill condition was permanent.

The testimony further showed that plaintiff and her family had attended the World's Fair at St. Louis, and that the injury occurred while returning therefrom; that while in St. Louis she attended the Fair regularly, walked about a great deal, never complained of being tired, and had all the appearance of a strong and vigorous woman. According to plaintiff's own testimony, she had journeyed twice with her husband to the Philippines, where she was in the habit of taking long horseback rides, lasting for days, merely for pleasure's sake, and had also ridden horseback at Ft. Reno. A number of witnesses testified as to the difference in plaintiff's appearance and health between the time she left Ft. Reno for St. Louis and the time she returned after the injury.

Dr. A. L. Fulton, connected with the defendant railway company as consulting surgeon, testified for the defendant that he, in company with Dr. Hamel, made an examination of plaintiff on the day of the injury. Her nose had been bleeding, but he could not see that it had been injured or broken. She complained of pain in the abdominal region and that something was wrong with her womb, and in order to relieve any irritation that might exist there Dr. Fulton inserted a small quantity of wool, saturated with ichthyol oil. He made no further examination save by palpation of the bowels. His opinion was that there was no displacement of the womb. Two weeks afterwards he and Dr. Hamel visited the plaintiff at the hospital, and found her sitting in a chair beside her bed. They asked her how she felt, and she replied that she was practically

well, and they understood her to say that she was going to leave the hospital next day.

Dr. Lester Hall, a physician and surgeon of Kansas City, who took charge of plaintiff a. day or two after the injury, testified that he examined her externally and found her suffering from pain in the abdomen. He advised local applications of antiphlogistine and hot water bottles to relieve the soreness, and this was kept up for about two weeks. He also discovered that the womb was much enlarged, but not extraordinarily sensitive, and that there was no displacement. Her side was somewhat swollen and very sensitive to pressure, and it was his opinion that such condition might result from a severe muscular strain, or a blow or concussion. About two weeks after this examination he performed an operation upon her. There had been a rupture of the perineum in giving birth to a child, and he cut away the scar tissue and sewed up the lacerated parts. This, however, was an old laceration, and she had been going about for years, in that condition. He also performed an operation on plaintiff's womb, curetting it. She remained in the hospital about five weeks, and kept to her bed during nearly all that period, and when she left the hospital she was carried to her carriage.

The testimony of witnesses differed as to the rate of speed of the passenger train at the time of the collision. The engineer and fireman testified that the speed was about four or five miles an hour, while Dr. McDonald, who was in the same car with plaintiff, testified that in his judgment the train's speed was at the rate of twelve or fifteen miles an hour. The testimony further tended to show that there was a curve in the main track at the point where it converged with the cross-over track, and that neither the engineer nor fireman from the positions they occupied on the engine of the passenger train could see the misplaced switch in question, and had to depend on the signals of the

switchman. As soon as the engine turned in on the cross-over track the engineer, according to the testimony, put on the emergency brakes and did all in his power to stop the train and prevent the collision. Defendant's switchman testified that he lined up the switches properly five minutes before the starting time of the train, and gave the signal to go ahead, and that he was about three hundred feet away from the misplaced switch at the time of the collision. The conductor on board the train testified that he was in the smoking car, standing up, and that when the collision occurred he was thrown backward against the door, but that he kept to his feet.

It is claimed by defendant that the trial court committed error in permitting non-expert witnesses to state their opinions as to plaintiff's state of health before and at the time of her injury. It is well settled by the authorities that a non-expert witness may give his opinion as to the apparent health of a person whom he has had the opportunity to observe. So may a non-expert give his opinion in a great variety of cases, when the facts known to him, and to which he would be competent to testify, would furnish no predicate whatever for the opinion of an expert witness. As a rule, such are confined to questions of identity, and such matters as may be open to the senses, but incapable of exact description. Thus, a non-expert "may testify that a person appeared to be suffering, was weak and helpless, appeared sick, looked pale, or paler than usual, or was declining in health." [12 Am. and Eng. Ency. Law (2 Ed.), 491.]

In State v. Buchler, 103 Mo. l. c. 207, it is said: "If the expressions of the countenance of one accused of crime could be seen by or reproduced before the jury exactly as it was at the time, and immediately before and after the act, there can be no doubt it would have great weight in determining the intent and purpose of the accused; often it would be absolutely con-

vincing. Such being its character, evidence of such expressions would certainly be admissible. The general rule, it is true, is that a witness must testify to facts, and the jury draw its conclusions from these facts. There are, however, manifestations, expressions and conditions which language, at least of ordinary persons, cannot reproduce. Of such matters a witness is allowed to give the impression produced upon himself. This impression may be very near to an opinion. . . . A person of ordinary understanding could not detail facts which would give to a jury the remotest idea of the passions expressed on the countenance, though a child one year old would distinguish anger from love in its mother's face. Witnesses are permitted to testify to their impressions or opinions on such matters, for want of any other way to get the evidence before the jury.''

In confirmation of what has been said, we call attention to the case of State v. Ramsey, 82 Mo. 1. c. 137, 'where a witness was allowed to state that a certain man ''looked like he was scared.'' In State v. Parker, 96 Mo. 1. c. 393, a witness was permitted to state that certain weeds looked like they had been pressed down by one's knees; and in Fulton v. Railroad, 125 Mo. App. 1. c. 247, it is ruled that a non-expert witness may give his opinion as to state of health, hearing or sight, or the ability of another to use his arms or legs naturally, and whether such other is apparently suffering pain or is in possession of his or her mental faculties, or is intoxicated, excited, calm, angry, or the like. [State v. David, 131 Mo. 380; Quinn v. Railroad, 218 Mo. 545.]

The court, in our opinion, did not err in permitting the witnesses, or either of them, to testify as they did under the facts and conditions disclosed by the record.

It is next insisted by defendant that instruction numbered 5, given at the instance of the plaintiff, is erroneous, on the ground that it practically amounts to a statement to the jury that, in the opinion of the

court, the evidence warranted the jury in returning a verdict for any sum up to $50,000. Said instruction is as follows:

"The jury are instructed that if, under the other instructions and evidence in this case, they should find for the plaintiff, they will assess her damages at such sum as they may find and believe from the evidence will compensate her for all bodily pain and mental anguish that they may find and believe from the evidence she has suffered as a necessary, natural and proximate result of any injury she has sustained by reason of the bruising or breaking of her nose, if any, or by reason of the bruising or mashing of her side or lower portion of her body, if any, or by reason of any such bruising or mashing of her side or lower portion of her body resulting in the displacement of her womb, if any, or by reason of any injury to her nervous system resulting from a blow to her side or lower portion of her abdomen, if any, as well as any permanent injury, if any, she has sustained from any of the above named injuries, not exceeding the total sum of fifty thousand dollars."

As to this instruction defendant contends that, in a case of this kind, it is contrary to the great weight of authority in this country. While counsel for defendant concedes that some of the decisions of this court seemingly approve the giving of an instruction limiting the amount of the recovery to the amount claimed in the petition, he contends that the cases in which that practice has been approved, or in which it was said that an instruction of that kind should have been given, were cases growing out of contract where the damages were susceptible of definite ascertainment, and that in a case like this the damages are not susceptible of definite ascertainment.

We are unable to concede that such an instruction is given only in cases growing out of contract where

the damages are susceptible of easy ascertainment. An instruction of that kind has in many instances been given in actions for personal injuries, slander, libel— in fact in all kinds of actions sounding in damages. Indeed, the correctness of such an instruction in damage cases does not seem to have ever been questioned by this court. It is almost a literal copy of an instruction given in Logan v. Railroad, 183 Mo. 582. Instruction No. 2 in Devoy v. Railroad, 192 Mo. 197, concludes with like language, with reference to which instruction and one other given in that case, LAMM, J., says: "The following instructions, to be commended as models of everyday simplicity, legal precision and comprehensiveness, . . . were allowed." In Tandy v. Railroad, 178 Mo. 240, an instruction which told the jury that "if they find for the plaintiff, they will assess at such sum as they believe from the evidence will be a fair compensation to plaintiff, . . . not exceeding the specified amount," was approved.

While similar instructions seem to have been condemned by the courts of other states, as shown by the decisions cited by counsel for defendant in his brief, we prefer to adhere to our own decisions as the settled law of this State, and as supported by the better reason.

Said instruction is criticised upon the further ground that it submitted to the jury issues not presented by the petition. This criticism we regard as too technical, as well as unjustifiable. The instruction embraces no matter of importance not covered by the petition.

In the motion for a new trial it is alleged that the amount of the verdict is excessive. At the time of the trial Mrs. Partello was forty-six years of age, and the testimony was that at the time of and prior to the injury she enjoyed excellent health. The evidence would indicate that she was severely injured, but the exact nature of the injuries sustained is not very plain.

Miss Carrico, the nurse who waited on her at the hospital, was the only witness who testified that plaintiff's womb was displaced, the physicians who examined her the day after the injury testifying that there was no displacement. It is shown by the evidence that the lower part of her right side was swollen and that there was great soreness in the abdominal region, which was the condition for some weeks, and her physicians at Ft. Reno testified that, in their opinion, this was caused by a severe blow or concussion. None of her bones were broken, and no joint dislocated or injured, and at the time of the trial there was no apparent disfigurement save a slight mark on the nose. The physicians who made personal examinations of her condition disagree in their opinions as to the permanency of her injuries, those testifying on the part of plaintiff stating that they were permanent, and those on the opposite side that they were not. She testified that she had been a nervous wreck since the time of the injury, and a physician who examined her just before the trial testified to the same effect.

The plaintiff was entitled to just and adequate compensation for her injuries, pain and suffering, and no more, there being no elements of malice in the case. As said in Adams v. Railroad, 100 Mo. l. c. 569, "The amount of damages in cases of this kind must be left largely to the discretion of the jury, and their verdict ought not to be disturbed unless the amount is so gross as to shock the sense of justice of the judicial mind, and satisfy it that such a verdict must have been the result of passion, prejudice or partiality." The verdict should not be permitted to stand when no inference can be drawn therefrom other than that it is the result of passion or prejudice.

In the case of Ice Co. v. Tamm, 90 Mo. App. l. c. 202, the St. Louis Court of Appeals used the following language: "When the amount assessed is so glaringly unauthorized by any evidence, so outrageous and con-

scienceless as to compel a conviction that the jury were poisoned with prejudice and inflamed with resentment against the losing party, and therefore incapable of impartially weighing the evidence on the various issues submitted to them, their verdict must be wholly set aside. They are proved by the event to have been dominated by sentiments which unfitted them to participate in the administration of justice, and this would have been ground for setting aside the array in the first place had their state of mind been known."

Chlanda v. Railroad, 213 Mo. 244, is in many of its features very similar to the case at bar. In that case the amount sued for was $35,000, and the verdict was for $18,000. On motion of the defendant the court granted a new trial and the plaintiff appealed. In course of the opinion delivered by this court, LAMM, J., speaking for the court, said: "The verdict is a heavy one. While it must be viewed with serene judicial judgment, yet its very size bespeaks anxious judicial scrutiny. It stands conceded there were no broken bones. There was once a slight and very temporary discoloration, but never a visible scar. There were and are no discoverable lesions or known existing abnormal organs traced to the injury. That Mrs. Chlanda has resulting nervous trouble seems put beyond all question. Her main symptoms are classified by men of science as subjective instead of objective—that is, they are got at through her own statements, except as to those visible indices such as the expression of her countenance, her loss of weight and her use of artificial aids in moving about. The testimony of her experts was based on examinations antedating the trial by a year or more. Their conclusion as to the permanency of the injuries to her nervous system must be tempered by that fact. The disinterested commission of doctors appointed by the court gave it as their opinion that the probabilities of recovery were in her favor. We find no testimony from physicians who

examined her condition at or close to the time of the trial tending to show that she was not in a class suffering from nervous trouble colored and somewhat affected by psychological phenomena prone to disappear when her mind was set at rest. We say this without the slightest intent to indicate our belief in the lack of sincerity and honesty of the worthy lady whose cause is held in judgment. There being no elements of malice in the case, she was entitled (not to punitive damages, but) to just compensation—no more. We are of opinion the order granting a new trial may be sustained on the theory of an excessive verdict somewhat attributable to such overwrought sympathy on the part of the jury as amounts (in legal effect) to prejudice and passion. There was an assignment of error to that effect in the motion for a new trial, and the order granting one may stand on that assignment.''

From a reading of the facts disclosed by the record in this case, it is apparent that the amount of the verdict is excessive and beyond reason, and so gross as to shock the sense of justice. It cannot be accounted for upon any theory other than prejudice or passion. That it was largely excessive was tacitly admitted by plaintiff when she remitted therefrom the large sum of $10,000, leaving the verdict yet remaining at an excessive amount. [Gibney v. Railroad, 204 Mo. 704.]

We think the ends of justice will be subserved by a new trial. The judgment is reversed, and the cause remanded. All concur.